IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-8288-CIV-MARRA/SELTZER

AIR TURBINE TECHNOLOGY, INC.,  )
a Florida corporation,  )
  )
  )
      Plaintiff,  )
   vs.  )
  )
ATLAS COPCO TOOLS AND ASSEMBLY  )
SYSTEMS AB, a Swedish corporation,  )
ATLAS COPCO NORTH AMERICA, INC.,  )
a Delaware corporation, and ATLAS COPCO  )
TOOLS & ASSEMBLY SYSTEMS, INC., a  )
Delaware corporation,  )
  )
  )
      Defendants.  )
————————————————  )

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION UNDER RULES
26(b) AND 30(a)(2) TO EXTEND DEPOSITIONS AND FOR COSTS**

Plaintiff, Air Turbine Technology, Inc. ("ATT") files this Memorandum of Law in Opposition to Defendants' Motion Under Rules 26(b) and 30(a)(2) to Extend Depositions and for Costs, and states as follows:

**I.    THE MOTION TO "EXTEND DEPOSITIONS" MISREPRESENTS THE PROCEDURAL HISTORY OF THE CASE IN ORDER TO RESCUE DEFENDANTS FROM THE CONSEQUENCES OF THEIR 18 MONTHS OF INACTIVITY IN DISCOVERY.**

**A.    Plaintiff Took Depositions Between May and August, 2002; Defendants Took One Deposition Prior to October 2002.**

Defendants' motion paints the picture of a relentless Plaintiff obstructing and preventing the Defendants from diligently discovering and bringing to light the truth. Nothing can be further from the reality of what has transpired in this case to date.



As an example, this case was filed in April 2001. The Defendants took <u>one deposition</u> between that date and October 2002, a period of 18 months. Plaintiff took 6 depositions in January and May 2002, and scheduled most of the remainder for July and August so as to be ready for trial. The case had been set <u>for trial</u>, initially to commence October 28, 2002. Plaintiff's lead counsel suffered a heart condition in July 2002, which Defendants suggested be the basis for a joint motion for continuance, based upon counsel's recuperation time. Plaintiff's remaining 8 depositions were taken, as scheduled, in July through August. The Court granted the continuance motion in September and only in October 2002 did Defendants bestir themselves to engage in deposition discovery, with a December 1 discovery cutoff at that time.

ATT stated in its Initial Disclosure of June 14, 2001 that:

Distributors and Representatives

> Documents will be produced on request (pursuant to Protective Order) containing the names, addresses and telephone numbers of Air Turbine distributors and representatives. These numerous individuals have information with respect to Air Turbine sales and marketing, distribution, competition, product characteristics, quality and other subjects which may be used to support Air Turbine's claims and/or defenses.

(Plaint. Rule 26(a)(1) Initial Disclosures, at 3, attached as Ex. B to Defs' Mot.).

The Initial Disclosures further listed categories including, "Executed Distributor Agreements," "Correspondence between Air Turbine Technology and Distributors," "Distributor Policies," "Distributor Agreement Forms," and "Price Lists, Distributor Policy Letters and Discount Agreements for Distributors." *Id.* These documents, including over 1000 pages of distributor correspondence and materials, were produced pursuant to a Protective Order in December 2001.

Following an investigatory trip to Europe by Plaintiff's counsel, the names of specific, individual distributors and others with knowledge of the effects of Defendants' unlawful conduct were provided in interrogatory answers on June 2, 2002.   In August and September 2002, statements under oath were obtained by Plaintiff from these distributors and produced to the Defendants.   Finally, after the continuance, in October 2002 Defendants announced that they wanted to take these individuals' depositions.   It was obvious to all that Defendants had no chance to take these depositions under the Hague Convention because of the long lead time for service required.   At Defendants' request, therefore, Plaintiff made the arrangements for the depositions to be taken, voluntarily, of distributors in five countries – Sweden, the Netherlands, Switzerland, Germany and Denmark.

During the week of November 4, 2002, Plaintiff's counsel defended three depositions taken by Defendants, each of which proceeded for seven hours,[1] then left for Europe to defend the voluntarily arranged depositions of five witnesses in non-metropolitan areas of five central European countries within two weeks time.   As soon as the wheels were up on the plane heading for Europe, Defendants filed a Motion for Summary Judgment on November 13, 2002, and a series of deposition notices for ATT employee witnesses to appear, prior to lead counsel's return to the U.S., or within a few days thereafter.   Naturally, these calculated moves were protested as being violative of the spirit of professionalism that the Court seeks to prevail in litigation in this district.   Moreover, these depositions exceeded the limitation provided in Rule 30(a)(2) for no more than 10 depositions absent leave of court or a written stipulation.   Defendants had not sought leave of court nor was there any stipulation.   To the contrary,

---

[1]     The Law of Unintended Consequences appears to apply to this rule of "limitation."   Now it appears that no deposition can last for less than seven hours.

Defendants had refused to stipulate and strenuously resisted Plaintiff's earlier application to the Court to take more than 10 depositions.

**B.     The Transcript of the Conference Between the Parties and the Court of June 18, 2002 Demonstrates Defendants' Distortions of the Record.**

Defendants' historical recitation in its Memorandum of the background and bases of its actions in discovery thus far, clearly appears to suffer from "the human tendency for rationalizing the past to explain the present." Beckman Instruments, Inc. v. Technical Dev. Corp., 731 F.2d 1076, 1084 (7th Cir. 1984). Defendants lament that there is no transcript of the June 18, 2002 discovery conference of the parties with Judge Middlebrooks is unfounded.[2] There is a transcript and a copy of it is attached hereto as Exhibit A. It reveals explicitly that contrary to the current representations made by the Defendants in their Memorandum, Defendants said not a word to the Court about ATT "never specifically identifying by name the individuals with knowledge in the case." (Defs' Memo, at 5). To the contrary, Defendants told the Court:

> Merely the effect that someone would have discoverable information does not mean you are entitled to take their deposition. I am willing to venture to say there are thirty, forty people with some information relevant to both sides' claims. It doesn't mean you are entitled to take thirty or forty depositions.

(Trans. at 6 (Mr. Pivnick), attached as Ex. A hereto).

Mr. Pivnick's view, expressed then, was that "the ten deposition limit imposed by Rule 30 and required by this Court, is meant to require a litigant to focus his discovery efforts." Id. Mr. Pivnick further told the Court: "It is a much simpler case than Mr. Horn makes it out to be. . . .  So we think ten depositions would require him to actually focus his efforts and see what his actual claims are and then pursue them from there." (Trans., at 7 (Mr. Pivnick), attached as Ex. A hereto).

---

[2]     See Defs' Memo, at 3, n. 4.

C.    **Now the Defendants Claim that the "Much Simpler Case" Entitles Them to Extraordinary Discovery After Discovery Will Have Closed Under the Scheduling Order.**

This 'much simpler case' now allegedly requires the Defendants to be allowed, in discovery sought in the final month prior to the close of the discovery period which lasted 21 months, to seek (i) an additional five 30(b)(6) depositions (after taking seven hours of a 30(b)(6) deposition of a company that has 6 employees); (ii) an additional individual deposition of the 30(b)(6) witness; (iii) depositions of individuals who were identified in Plaintiff's Initial Disclosures (William Doyle, Richard Rhoney); and (iv) "two or three other third party witnesses," (Defs' Memo, at 9), who are so mysterious they cannot be identified by the Defendants. In sum, Defendants are asking in the final 20 days of discovery to take 12 additional depositions which in the 21st month of discovery have suddenly become known and crucial to Defendants' case. This was not Defendants' position to the Court earlier and there is absolutely no justification for their waiting until the closing hours of discovery to demand the right to take more than double the number of depositions permitted by the Rule. The request is so outlandish it can only be meant as a negotiating position, hoping the Court will allow some more.

This is plainly a situation of superior resources seeking to crush smaller opposition. This is a case in which the Plaintiff, a company of $2-million in yearly sales with 6 employees, is taking on a defendant group of companies with over $5-billion in sales and 26,000 employees worldwide.[3]

---

[3] Moreover, Defendants are controlled by the Swedish Wallenberg family "the Royal Family of Swedish Business," Exhibit B hereto, through Investor AB and its controlling equity stakes in such firms as Electrolux, Ericsson, ABB, AstraZeneca, Saab AB and Scania, as well as SEB Bank.

As a case in point, Defendants refused to produce their expert reports on November 1, 2002 (they had Plaintiff's expert reports since June 7, 2002) and surrendered them only in respect to a subpoena served on the experts.  They then "consented" (without waiving a claimed right to have all experts' depositions taken by November 30) to depositions of their 6 experts during a slightly more than one week window between December 11 and December 18. Taking the depositions of 6 experts in three disciplines over 8 days is not conducive to penetrating analysis, but Plaintiff considered it better than nothing.  Certainly, it forced the hand of Plaintiff's lead counsel, who has taken and defended every deposition to date, to obtain the assistance of other lawyers to participate in this contrived gauntlet.  It should be remembered that Plaintiff's lead counsel's health was the basis for the continuance, which in no way caused Defendants' present contretemps.

### D.   Defendants Made No Complaint About Identification of Witnesses in the June 18 Conference.

Nor are the Defendants' representations about the basis for the Court's earlier order on interrogatories in accord with the record of the conference.  Defendants claim that they told the Court that Plaintiff's interrogatory answers were "woefully deficient" and "[o]ne of ACTAB's complaints" was that "ATT never specifically identified by name any individuals with knowledge of ATT's contentions."  (Defs' Memo., at 5).  This, of course, was false even if it had been stated since ATT identified individuals in its Initial Disclosure (several of whom, Edward Doyle, Simon Shane, Richard Rhoney, Defendants seek to depose 20 months later), and in its initial contention interrogatory answers.  But, in fact, no such complaint was made to the Court.  Mr. Pivnick never said a word about the interrogatories.  (Trans., at. 8-10, attached as Ex. A hereto).

Plaintiff noted to the Court that these contention interrogatories were being propounded early in discovery, and the Court said that Plaintiff was "not necessarily entitled to await discovery before setting forth these contentions." (Trans., at 10, attached as Ex. A hereto). After receiving Plaintiff's supplemental answers on July 2, 2002, Defendants never sought further Court action, thus acknowledging, albeit tacitly, that Plaintiff had adequately set forth its contentions.

There can be no justification for Defendants' demand for more than double the number of permitted depositions made at the close of discovery. The Court should deny the request in its entirety.

## II.   DEFENDANTS' COMPLAINTS ABOUT THE LEISNER DEPOSITION, BASED UPON A DEFECTIVE SUBPOENA, AND HAVING BEEN IN POSSESSION OF HIS REPORT AND THE DOCUMENTS HE RELIED ON, IS A SHAM AND NO BASIS FOR CONTINUATION.

Defendants devote 6-1/2 pages of their Memorandum and over 100 pages of exhibits to support their claim, again asserted at the eleventh hour, that they need 7 hours, or a full second day to depose Mr. Leisner. Defendants purport to advise the Court of the negotiation between the parties concerning additional deposition time. Defendants neglect to advise the Court that Plaintiff's offer of an additional three hours to depose Mr. Leisner came in respect to an offer made by Defendants' counsel, Mr. Pivnick, to Mr. Horn by telephone while Mr. Horn was in Europe, that Defendants would accept a 3-1/2 hour additional deposition time, but rejected 3 hours, in which Plaintiff insisted they could not go over matters previously covered. Thus, the Court is presented once again with Defendants' negotiating with the Court in effect for more than they would accept, and the parties and this Court's time is being consumed over 1/2 hour of Mr. Leisner's deposition time.

## A.    Defendants' Document Production Subpoena Was Defective.

Defendants rely upon a defective subpoena attached as Exhibit C to the Motion in support of their position that Mr. Leisner failed to produce documents prior to the date of his deposition.  The first and most glaring defect in the subpoena is the *duces tecum* portion to produce documents.  The subpoena is issued from the United States District Court for the Northern District of Illinois.  Mr. Leisner is a resident of the Northern District, and counsel for Plaintiff, who agreed to accept service for Mr. Leisner as a courtesy, is located in Chicago within the Northern District.  The documents, however, are commanded to be produced at the offices of Defendants' counsel in McLean, Virginia, not within the Northern District of Illinois.

Rule 45(a)(2), Federal Rule of Civil Procedure, requires that a subpoena issue from the District Court in which a deposition is taken and, by necessary implication, a subpoena for document production with a deposition subpoena must be from the district in which the deposition and production are to occur.  The Advisory Committee Notes to the 1991 Amendment to the Rule explicitly states that "[p]ursuant to Paragraph (a)(2), a subpoena for a deposition must still issue from the court in which the deposition or production would be compelled."  This is the accepted interpretation of the courts.[4]  Defendants are complaining about documents that they had requested by a defective subpoena, but were produced to them at the outset of the deposition anyway.

---

[4]    Amgen, Inc. v. Kidney Center of Delaware County, 95 F.3d 562, 564 (7th Cir. 1996), (stating that "Federal Rule of Civil Procedure 45(a)(2) provides that a subpoena commanding document production or attendance at a deposition shall issue from the district court for the district in which the document production or deposition will occur); Houston Business Journal, Inc. v. Office of the Comptroller, 86 F.3d 1208, 1212 (D.C. Cir. 1996).

More to the point, Defendants had been in possession of Mr. Leisner's report and virtually all of the documents that were brought to the deposition since June 7, 2002, or <u>four months</u> prior to the deposition. This early production was as a result of Defendants' manipulation of the timing delays caused by Plaintiff's counsel's health problems. Plaintiff's expert reports were delivered on the timetable for the October trial date. Plaintiff only received Defendants' six expert reports in late November, with all 6 to be deposed in 8 days to meet the Court's schedule.

The documents produced at the Leisner deposition that had not been earlier produced were either not relied upon by Mr. Leisner in reaching his opinion, but had been in his working file, or a copy of his report and documents produced four months earlier with "tick marks" or reference letters which Mr. Leisner had noted to quickly reference the supportive materials to the report. The "tick marks" were in no way necessary to an understanding of the report, or lack of which in any was impeded defendants' ability to understand Mr. Leisner's report or relate it to the previously produced supporting documentation. Defs. Mem., Ex. E (AC-L689-AC-L781). The report contained references fully and adequately relating the report to its sources. At no time in their four month possession of the report and documents prior to the deposition did defendants complain of difficulty understanding it. Defendants' complaints that they were deprived of the "tick marks" when the report and supporting materials had been in their hands for four months smacks of "alligator tears." Indeed, the entire Leisner issue can best be characterized as a "red herring" designed to cover the stench of 19 months of inactivity by Defendants, who suddenly require a completely revised Scheduling Order to suit their alleged needs.

The damage report is six pages long and is certainly not complex.  The factors analyzed are market size, allocation of the market and Atlas Copco's share, a reasonable royalty, the time value of money, and the damage time period.  All of these elements were inquired about in Mr. Leisner's deposition.  Defendants had more than adequate time to depose Mr. Leisner.

## CONCLUSION

Trial preparation is a necessary part of the case and it appears that Defendants intend to do their utmost to delay, disrupt and otherwise prevent this matter from coming to trial in a fair and orderly manner.

Respectfully, the motion should be denied.


DATED:  December 9, 2002                     Respectfully submitted,

                                             AIR TURBINE TECHNOLOGY, INC.

                                             By: _____
                                                   One of its Attorneys


Richard L. Horn
Florida Bar No. 091988
Gregory M. Smith
QUARLES & BRADY LLC
500 West Madison Street
Suite 3700
Chicago, IL  60661-2511
312.715.5000
312.715.5155 (Fax)
rlh@quarles.com
gms@quarles.com

Ned R. Nashban
Florida Bar No. 0717230
QUARLES & BRADY LLP
One Lincoln Place
1900 Glades Road, Suite 355
Boca Raton, FL  33431
561.368.5400
561.368.1996 (Fax)
nrn@quarles.com

Ka'imi Lani Jones
Florida Bar No. 0181201
Casey K. Weidenmiller
Florida Bar No. 0521035
QUARLES & BRADY LLP
4501 Tamiami Trail North
Suite 300
Naples, FL  34103-3060
239.262.5959
239.434.4999 (Fax)
cw9@quarles.com
kjones@quarles.com

## CERTIFICATE OF SERVICE

I, Richard L. Horn, certify that I caused to be served the foregoing

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION UNDER RULES 26(b) AND 30(a)(2) TO EXTEND DEPOSITIONS AND FOR COSTS**

by facsimile transmission and by U.S. Mail upon:

| | | |
|---|---|---|
| Susan Kohlmann | William P. Atkins | John C. Dotterer |
| Pillsbury Winthrop LLP | Scott J. Pivnick | John C. Dotterer, P.A. |
| One Battery Park Plaza | Pillsbury Winthrop LLP | 125 Worth Avenue |
| New York, NY 10004-1490 | 1600 Tysons Boulevard | Suite 310 |
| Fax: (212) 858-1500 | Suite 100 | Palm Beach, FL 33480 |
| | McLean, VA 22102 | Fax: (561) 802-3318 |
| | Fax: (703) 905-2500 | |

attorneys for Defendants, on this 9th day of December, 2002.

_____
Richard L. Horn

# EXHIBIT A

```
1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF FLORIDA
2                         NORTHERN DIVISION

3

4   AIR TURBINE TECHNOLOGY,      )
    INC.,                        )        CASE NO. 01-8288-CIV
5                                )        West Palm Beach,
                                 )        Florida
6                 Plaintiff,     )        June 18, 2002
                                 )        11:30 o'clock, a.m.
7                                )
                                 )        Pages___ to____
8             vs.                )
                                 )
9                                )
    ATLAS COPCO AB, etc.,        )
10                               )
                  Defendants.    )
11  _____)

12

13

                 TRANSCRIPT OF DISCOVERY HEARING
14         BEFORE THE HONORABLE DONALD MIDDLEBROOKS,
                 UNITED STATES DISTRICT JUDGE
15

16
    APPEARANCES:
17
    For The Plaintiff:     Richard L. Horn, Esq.
18                         Attorney-At-Law

19

20  For The Defendant:     Scott J. Pivnick, Esq.
                           -and- Willie Bazea, Esq.
21                         Attorneys-At-Law

22

23  Court Reporter:        Roger Watford, RMR
                           Official Court Reporter.
24                         Miami, Florida

25
```

**EXHIBIT A**

2

```
 1              THE COURT:  Okay, this is a hearing on
 2    discovery issues in the case of Air Turbine Technology
 3    versus Atlas Copco, Case Number 01-8288.
 4              May I have appearances please.
 5              MR. HORN:  Richard Horn for the plaintiff Air
 6    Turbine Technology.
 7              MR. PIVNICK:  Scott Pivnick for defendants.
 8    With Your Honor's permission I would like to put you on
 9    speakerphone so I can have an associate listen in as
10    well.
11              THE COURT:  Okay.
12              MR. PIVNICK:  Thank you.  That associate's
13    name will be Willie Bazea.
14              THE COURT:  Okay.
15              We've got some issues with respect to
16    discovery.  The first is the number of depositions.  The
17    plaintiff has taken six and wants an additional nine and
18    I think defendants agreed only to four.
19              Let's I guess hear brief argument on that.
20              MR. HORN:  Your Honor, this is Richard Horn
21    speaking.  So far we have taken one 30(b)6 deposition
22    and that was of a witness who did not have direct
23    information about the facts of the case other than the
24    contract itself.
25              We took that deposition in January because the
```

1    9/11 situation apparently prompted the Swedish defendant

2    to adopt a policy that they didn't want their employees

3    to come to the United States, so that slowed matters

4    down.

5         We took five depositions in Stockholm last

6    month and those led us to believe that we need these

7    additional nine depositions.  Five of the individuals

8    that we want are identified in the initial disclosure of

9    the defendants as to persons who have discoverable

10   information regarding the facts of the case.

11        Just to digress for one moment, the case

12   involves power tools that first were purchased by the

13   defendants from the plaintiff in the early '90s, and

14   then, as a result of breaches of the contract, the

15   contract was terminated with the exception of the

16   provisions having to do with exploiting the patents and

17   the technology of the plaintiff.

18        The defendants looked for a replacement for

19   several years, they found something and introduced it to

20   the market, it was a completely ineffective, defective

21   tool, but it was advertised as being equivalent and

22   identical essentially to the plaintiff's product, and

23   they used the same advertising almost word-for-word that

24   they used for the plaintiff's product in advertising the

25   defendant's new product, which was false advertising.

1   The tool did not meet any of the specifications
2   advertised, and so forth.
3          As a result, the entire technology was damaged
4   because the defendant is the world's largest power tool
5   maker and seller of many brands and it was believed by
6   many people who tried their tools that they couldn't
7   make a tool that would operate using this type of
8   technology, which is governed turbine technology that
9   nobody else could, and our sales suffered as a result of
10  the false advertising.
11         So our claims in the case are patent
12  infringements, false advertising under the Lanham Act
13  and four common law claims, unfair competition, breach
14  of contract, breach of confidential relations and
15  fraud.
16         Anyway, the five of the nine additional
17  depositions that we want to take are individuals who the
18  defendants have named as people with information which
19  is discoverable and relevant.  The other four
20  individuals include the manager who was in charge of the
21  product, managers who were selling the tool, the
22  director of marketing of the company, who is responsible
23  for all of the sales and advertising information that
24  came out of it.
25         Another individual who we want to take is the

1  product designer and service man for the tool who

2  traveled to Germany and met with the makers of the tool

3  and should have been aware of what the tool's capacities

4  were.  And the one last deposition is a person who was,

5  during some period of time he was in charge of the

6  research and development of the Swedish company, then he

7  became the general manager of the company.  He's now, as

8  I understand it, the general manager of the U.S.

9  subsidiary of the company.

10         So we believe that those depositions are

11  clearly all relevant witnesses and in a case involving,

12  as this does, a large number of claims.  There are an

13  awful lot of individuals involved.  We would love to be

14  able to take more than these, but we have trimmed the

15  list down.  We have dropped in our negotiations with the

16  defendant the depositions of a couple of deponents who

17  we believe that we can live without.

18         But we would be faced with a situation where

19  we might not be able to take the depositions of who

20  their trial witnesses are going to be if we can't take

21  these depositions.  So we believe that 15 is not an

22  unreasonable number for this case.

23         MR. PIVNICK:  Okay, Your Honor, Scott

24  Pivnick.  I take issue with many of the factual

25  assertions Mr. Horn made, but I will of course not go

1  through them all, but suffice it to say it is the

2  defendant's view that plaintiff is basically on a

3  fishing expedition.

4        In order to convey the full magnitude I urge

5  you to look at the documents we submitted, the expert

6  report and their interrogatory responses where they make

7  many, many allegations with no factual support, and it's

8  our view that they are trying to get as many witnesses

9  as possible in terms of trying to put together some type

10  of claim that might convince a jury that there's some

11  liability.

12        As I stated in my June 10th letter, which we

13  provided to you, Mr. Horn's factual contentions to

14  support his claim are nonexistent, barely meet Rule 11

15  standards, and it's my view that Rule 30, the ten

16  deposition limit imposed by Rule 30 and required by this

17  Court, is meant to require a litigant to focus his

18  discovery efforts.

19        Merely the effect that someone would have

20  discoverable information does not mean you are entitled

21  to take their deposition.  I am willing to venture to

22  say there are thirty, forty people with some information

23  relevant to both sides' claims.  It doesn't mean you are

24  entitled to take thirty or forty depositions.

25        A plaintiff should not be permitted to put up

7

1    some baseless allegations and then go searching through

2    a corporation to try and find someone who might have one

3    scintilla of evidence to support their claim.  I would

4    like to get into it more when I talk about their

5    interrogatories, but it should also be noted that these

6    are not depositions down the street.

7            These require trips to Sweeden, which is very

8    time consuming and grueling to go there and take all

9    these depositions.  We've done it once already.  The

10   other individuals are in the U.S. in Michigan, but this

11   is not a simple case of, oh, it's just down the street,

12   they won't be that expensive to do.  We are talking

13   about a significant expense to require us to go to

14   Sweden to all these additional individuals.

15           So I just do not believe that the case

16   warrants it.  It is a much simpler case than Mr. Horn

17   makes it out to be.  And the fact is he has no claims to

18   base it on and he is trying to go out searching for

19   them.  So we think ten depositions would require him to

20   actually focus his efforts and see what his actual

21   claims are and then pursue them from there.

22           THE COURT:  Okay.

23           I think I should let him take the additional

24   nine depositions.  I am going to allow the discovery of

25   the nine given the issues raised in the case.

1      Let's go ahead and deal with those

2   interrogatories at this point because it sounds like you

3   wanted to speak further to that.  And you're the, I

4   guess the movant there.

5      MR. HORN:  We are both movants on these, Your

6   Honor.

7      THE COURT:  Well, then let me hear from you,

8   Mr. Horn.  It looks to me like you haven't given him the

9   information he requests with respect to his contention

10  interrogatories.

11     MR. HORN:  Well, these were propounded to us,

12  first of all, at a time when we had had one 30(b)6

13  witness who had not had, who was not directly involved

14  in any of the factual matters.  We gleaned some

15  information from the depositions that we took in

16  Stockholm.

17     THE COURT:  On a patent claim I would at least

18  think you could tell them what claims of the patent you

19  contend to have been infringed upon, so I don't

20  understand why you couldn't answer those questions

21  without doing discovery.

22     MR. HORN:  Well, we have given them an expert

23  report at this point which states that every claim in

24  the patent is infringed.  What was disturbing to me at

25  that point was that the Court set a date for the expert

1 to give his opinion and I believe that they were looking

2 for the information before the expert was able to

3 complete his work.

4      But, in any event, they have that information

5 at this point in the form of the experts' reports.  We

6 have delivered to them two expert reports on the patent

7 issue and we have given them one expert report on the

8 damages issue.

9      On the damages report, which the defendant has

10 sent you a copy of, I believe it really is not relevant

11 to anything that is involved in these issues.  But they

12 have refused to produce any information whatsoever about

13 any sales or other information concerning anything

14 outside of the United States.

15      And if this were merely a patent claim they

16 might have some basis for that.  But the Lanham Act has

17 extraterritorial extension and I can give the Court

18 Eleventh Circuit authority on that.  The common law

19 claims certainly have damages extensions to anywhere

20 that they are committed.

21      What they are really doing is belatedly trying

22 to attack the jurisdiction of this Court.  The Court has

23 personal jurisdiction and subject jurisdiction over the

24 parties who are involved in the case at this point and

25 there's no basis for them withholding that information.

1   That, of course, goes to our contentions on their

2   interrogatories rather than ours.

3           But we have, you know, I can supplement

4   certainly the patent claims, and once I've taken these

5   other depositions, if these are genuinely contention

6   interrogatories, the way almost all of them are worded,

7   they really aren't asking for contentions but discovery.

8           At the close of discovery I would certainly be

9   able to give them that in a fuller form, but I believe

10  that what I did give them at the time that I gave it to

11  them was a full and fair exposition of what our theories

12  of the case were and what the facts were that we

13  believed we were going to be able to prove and had some

14  evidence to prove, but we need to get some evidence from

15  them.

16          THE COURT:  Okay.

17          I am going to order you to provide more

18  complete answers to the contention interrogatories.   I

19  don't think you have provided them adequate information

20  and are not necessarily entitled to await discovery

21  before setting forth these contentions.

22          And so how long do you need to respond?

23          MR. HORN:  Well, we are scheduled to take

24  expert depositions all of next week.  I certainly could

25  do it with the rest of this week and a few days in the

1    following week.  So two weeks from today would be

2    possible.

3              THE COURT:  Okay, is two weeks from today

4    adequate Mr. Pivnick?

5              MR. PIVNICK:  That is, Your Honor.

6              But that brings me to an important point in

7    that I don't believe I can adequately take his experts'

8    depositions prior to getting the supplemental response.

9    And the main reason for it, if you look in Mr. Lasner's

10   report, he talks about using air turbine technology and

11   then applying that to a damages calculation.

12             The problem is neither in Mr. Lasner's report

13   nor in their contention interrogatory responses do they

14   ever identify what this technology information is that

15   we have allegedly exploited.  Now, without that type of

16   information I really cannot adequately question

17   Mr. Lasner.  That would require me to come back to him

18   after I have gotten them.

19             That goes to a bigger issue.  Mr. Horn and I

20   have discussed extending the time for discovery in the

21   schedule up to sixty days for this as well as for

22   deposition reasons.  But at this point I don't think I

23   can take his expert depositions until at least two weeks

24   after I get his supplemental respones.

25             THE COURT:  Okay, let's try to deal with these

1    an issue at a time.  You then have two weeks from today

2    to give complete answers to these contention

3    interrogatories.

4            What issues, additional issues, if any, are

5    there in this case?  And let me say, it would seem to me

6    that lawyers ought to be able to resolve some of these

7    issues themselves.  But tell me your next issue.  What

8    is this issue as to sister and parent corporations or

9    extraterritorial discovery?

10           MR. HORN:  Well, this comes back to what I was

11   referring to earlier, which is that they have refused to

12   give us any information for any entities having to do

13   with damages, and so forth, for anything outside of the

14   United States.  And these are in their responses to the

15   requests for production and interrogatories which I sent

16   to Ms. Gayle, so I believe they should be there.

17           What they have said is they are set up with

18   all of their sales corporations and their parent

19   corporation being separately incorporated, and,

20   therefore, they have no ability to obtain this

21   information and that I should go around the world, they

22   have eighty sales companies in different countries, they

23   have wholly owned subsidiaries in, as well as

24   distributors, in fifty other countries, and try to get

25   my information that way.  Well, of course, that is

1    impossible.

2            So we have partially resolved that but not

3    fully.  What they have agreed to do at this point is,

4    okay, they will send an e-mail to their sales companies

5    and ask them for brochures and advertising materials

6    having to do with this product, but they have not agreed

7    to obtain any of the other information which we have

8    asked for in interrogatories and requests for production

9    because they say they are separate corporations and they

10   have no control over them.

11           Well, I have the deposition of an individual

12   who I took in Stockholm, the product manager, who said

13   that all he would have to do is send an e-mail to these

14   companies and they would cooperate and they would send

15   this information.

16           And that is sufficient under the law, Rule 34,

17   and there are plenty of federal decisions, one very

18   recent in the past couple of weeks, that goes to this

19   and says that control over a parent subsidiary,

20   subsidiary, parent/sister subsidiaries, is a practical

21   matter and if they can obtain the material that is

22   sufficient for it to be controlled.  And I have a

23   witness testifying they can't, which is not surprising.

24           So the requests that we have made have not

25   been complied with and we don't have a lot of

1   information.  We don't have the information yet as to

2   what they say they agreed to supply to us.

3        MR. PIVNICK:  Well, I will briefly respond to

4   that, Your Honor.  I guess, first off, this is the first

5   I had heard that Mr. Horn was still unhappy.  I have

6   thought we had come to an agreement on this issue and he

7   was happy with what we agreed to and this is actually

8   the first I have heard that he was not happy.

9        That being the case, though, to begin, the

10  deposition testimony he's speaking of is one individual

11  lower level manager who believes that he might be able

12  to get something if he e-mailed it.  But he actually

13  said he did not know if they would comply.  And he also

14  is not a 30(b)6 witness who could bind the corporation

15  and would have knowledge of that type of thing.  He was

16  kind of outside his bailiwick on that.

17       And the fact remains that these companies are

18  not under any of the remaining defendants' control.

19  While I don't want to testify, the corporate structure

20  is, at least Atlas Copco AB, which was previously

21  dismissed by this Court, is a holding company of a lot

22  of different companies.  Atlas Copco Tools AB is one of

23  them.

24       They also own separately and apart different

25  holding companies which in turn hold different sales

1    companies in different parts of the world.  So it could

2    be said that perhaps Atlas Copco AB are not subsidiaries

3    of Atlas Copco Tools AB, so we have no technical control

4    over them.

5         We have made a request, which I thought we

6    agreed to with Mr. Horn, for additional documents from

7    those companies.  They have been slow to react to us.

8    We really can't force them other than asking them again

9    for documents to do that.  We have no control over their

10   managers or their employees.  All we can simply do is

11   ask.

12        And, as I said, we also agreed to seek all the

13   documents he requests from another company called Atlas

14   Copco Power Distribution NV, which is kind of the

15   central warehouse for all sales of Atlas Copco, and we

16   asked them for documents, and I thought we had an

17   agreement on this with Mr. Horn.  This is the first I

18   heard he wants more documents beyond what he's already

19   asked for.

20        THE COURT:  With respect to this issue, let me

21   ask you all to meet and further discuss this.  If you

22   can't reach agreement, the dissatisfied party needs to

23   go ahead and file and fax a memorandum both to your

24   opponent and to us, and with five days to respond, and I

25   will award costs to the prevailing party on that issue.

1        Okay, any other issues?  What about this

2   discovery deadline?

3        MR. HORN:  I think we are in agreement on

4   that.  That's the only thing we are in agreement on.

5        MR. PIVNICK:  An extension of between thirty

6   and sixty days of all the remaining deadlines in the

7   case mainly because, as you may be aware of, in Europe

8   Atlas Copco entities basically shut down for all of July

9   and half of August and all the employees go on vacation

10  and leave town and that type of thing.

11       So, even before we had discussed all this we

12  had tried to work out some dates for them, but we would

13  not be able to get anything until after August 15th,

14  which is the discovery deadline in this case.  So, to

15  allow for that, we had discussed an enlargement which I

16  would now favor at sixty days based upon the contention

17  interrogatories, and also I would like two weeks after

18  that to then take the depositions of his experts and

19  work out a date for our expert reports.

20       THE COURT:  Well, the problem is the trial is

21  set for October 28th and I don't plan to move that.  I

22  don't have a problem moving the discovery deadline, but

23  I don't know if either side plans to file any

24  dispositive motion or where you are stand on that.  And

25  so that may affect what you want to do on discovery.  I

1   mean sixty days would take you until October 15th with

2   trial less than two weeks later.

3              MR. PIVNICK:  I guess we could try a September

4   15th discovery deadline and then keep the remaining

5   deadlines in place.

6              THE COURT:  All right.

7              MR. PIVNICK:  Mr. Horn, are you agreeable to

8   that?

9              MR. HORN:  I am agreeable to that.

10             MR. PIVNICK:  And I guess I would say I would

11  like it -- I am just looking at the calendar for a

12  moment.  If he provides his responses by July 2nd the

13  sooner we can work out the schedule with his experts, if

14  we complete them by say the 19th, we could then provide

15  our expert report August 1st.

16             THE COURT:  Okay.

17             Well, y'all work out those times.  I will

18  extend discovery for thirty days.  And any other -- you

19  can certainly change by agreement interim deadlines, but

20  the trial date I plan to leave where it is.

21             Anything else today?

22             MR. HORN:  I think we could try to work out

23  the other issues as to my interrogatories and document

24  requests and if we can't work them out then we'll follow

25  this memorandum procedure.

1      MR. PIVNICK:  If you don't mind, Your Honor, I

2  would like to address the non-U.S. sales issue.

3      Again, I think it all comes back to what is it

4  that the information is that he alleged to be

5  exploited.  To the extent it's only technology governed

6  by the patents then the non-U.S. sales would not be

7  relevant.  If he argues something beyond that then it

8  possibly could be.

9      I guess my concern is, without knowing what

10 his information is, I am concerned about him coming back

11 and seeking costs for us to supplement that not having

12 known it.

13     THE COURT:  Well, I can't rule on that at this

14 point.  I don't have enough knowledge to rule on that.

15 So I think y'all need to try to work it out.  If you

16 can't, file the motions, but it will be a loser pays

17 kind of approach in terms of this discovery issue.

18     MR. PIVNICK:  I understand.

19     MR. HORN:  That's fine, Your Honor.

20     MR. PIVNICK:  Thank you very much for your

21 time, Your Honor.

22     MR. HORN:  Thank you, Your Honor.

23     THE COURT:  Okay, thank you.

24     (Hearing concluded.)

25

19

<u>C E R T I F I C A T E</u>

1

2

3          I, Roger Watford, Official Court Reporter, do

4   hereby certify that the foregoing transcript is true and

5   accurate to the best of my, knowledge, skill and

6   ability.

7          Dated this     day of _____,

8   2002.

9

10

11   _

12                              Roger Watford

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B







| WELCOME | ▶▶ |
| | ▶▶ |
| | ▶▶ |
| | ▶▶ |

## Welcome to Investor AB

Investor AB has been making venture capital investments and actively working with its portfolio companies to maximize their value for almost 100 years. Today, Investor is Sweden's largest industrial holding company and a substantial, long-term shareholder in a number of global public companies. These "Core Holdings" are ABB, AstraZeneca, Atlas Copco, Electrolux, Ericsson, Gambro, OM, Saab AB, Scania, SEB and WM-data. In addition, Investor has over USD 3 billion dedicated to venture capital investments. The annual total return to shareholders has been 20 percent during the past 20 years.

Investor's core holdings:     ABB  -1.00  27.50        AstraZeneca  -8.50  334.00        Atlas Copco A  -8.00  194.00

**EXHIBIT B**



# Core Holdings

The Core holdings portfolio comprises large companies in which Investor owns a substantial percentage of the share capital and voting rights, and is the leading or one of the leading owners of the company. On September 30, 2002, the market value of Investor's core holdings was SEK 58 billion, corresponding to approx. 76 percent of total investments. The Core holdings are therefore of the greatest significance for how Investor's net asset value develops. The Core holdings include Ericsson, AstraZeneca, Scania AB, Atlas Copco, WM-data, SEB, Gambro, Electrolux, OM, ABB and Saab AB.

**Read More >>**

Investor's core holdings:    ABB  -1.00  27.50    AstraZeneca  -8.50  334.00    Atlas Copco A  -8.00  194.00

BBB HOMEPAGE | WORLD SERVICE | EDUCATION   low graphics version | feedback | help

# BBC NEWS

 

You are in: **Business**
Tuesday, 5 June, 2001, 15:46 GMT 16:46 UK

Front Page
World
UK
UK Politics
**Business**
Market Data
Economy
Companies
E-Commerce
Your Money
Business Basics
Sci/Tech
Health
Education
Entertainment
Talking Point
In Depth
AudioVideo

## Swedish business dynasty rejects change


Percy Barnevik insists Investor's performance is more important than its market value

The "Royal Family of Swedish Business", the Wallenberg family, has rejected calls by the Swiss billionaire financier Martin Ebner to change its ways.

Calls by Mr Ebner to split the family's holding company, Investor, into two separate firms were voiced soon after he boosted his stake in the publicly-listed group.

But they have been rejected by the powerful Wallenberg family which commands more than half the Investor votes.

Mr Ebner also wants Investor to buy back shares to boost the value of the remaining ones, and again the Wallenberg family says no.


Investor chief executive Marcus Wallenberg rejects Mr Ebner's calls

Investor chairman Percy Barnevik and chief executive Marcus Wallenberg both insist that Mr Ebner, who controls more than 10% of shareholder votes, should focus on the performance of the business rather than its shares, Swedish media reports quoted on Investor's website said.

**Search BBC News Online**

Advanced search options

Launch console for latest audio/video

- BBC RADIO NEWS
- BBC ONE TV NEWS
- WORLD NEWS SUMMARY
- BBC NEWS 24 BULLETIN
- PROGRAMMES GUIDE

**See also:**
14 May 01 | Business
Financier rocks family firms
07 May 01 | Business
Novartis buys 20% stake in Roche
28 Oct 00 | Europe
Swiss town: We're too rich
26 Feb 01 | Business
Drugs firms out of the dock
25 Apr 01 | Business
Drug industry searches for right medicine

**Internet links:**
Investor

The BBC is not responsible for the content of external internet sites

**Top Business stories now:**
WorldCom chiefs refuse to testify
Buoyant eBay snaps up bills firm
Digital TV woes hit Pace profits
Bush vows action after scandals
Merck 'exaggerated' revenue in accounts
Congress pushes accounting reform
Oil trade thaws US-Russian ties
HIV: the drug firms' quest for a cure

**Links to more Business**

Investor insists that its shares have
outperformed Sweden's main stock market
index, both in the past year, the past 10 years
and the past 20 years, the reports said.

**Ebner will not go away**

Mr Ebner's attack on the way the Wallenberg
family goes about its business is more than
just benign criticism from an outsider.

This is not only because of his reputation as a
shrewd businessman with an eye for
restructuring businesses but also because his
criticism is tough to counter, given the large
discount the markets place on Investor
shares.

In other words, Investor's share price is lower
than the combined net value of its assets.

Many investors are loath to buy into the
family-controlled company, essentially
because most Investor shares available carry
fewer voting rights than the preferential
shares held by the family.

As a consequence, even owners of large
stakes in Investor may have very little
influence.

**Intrinsic value**

But Investor owns controlling equity stakes in
a wide range of leading Swedish multinational
companies.

These include the health care group Gambro,
the mobile phone firm Ericsson, the
engineering company ABB and the drugs firm
AstraZeneca.

Buying back shares could be an effective way
of boosting Investor's share price.

And if the company was then split in two, it
would become more transparent. This too
should push its share price up.

Mr Ebner would favour a solution along these
lines.

But making it happen in the face of staunch
resistance from the Wallenberg family will not

**stories are at the foot of
the page.**

be easy, analysts said.

✉ **E-mail this story to a friend**

## Links to more Business stories

In This Section [ ▼ ]   GO

© **B B C**   ^^ **Back to top**

**News Front Page | World | UK | UK Politics | Business | Sci/Tech | Health |
Education | Entertainment | Talking Point | In Depth | AudioVideo**

--------------------------------------------------------------------------------
**To BBC Sport>> | To BBC Weather>>**
--------------------------------------------------------------------------------
© **MMII | News Sources | Privacy**